******************************************

The "officially released" date that appears near the beginning of an opinion is the date the opinion will be published in the Connecticut Law Journal or the date it is released as a slip opinion. The operative date for the beginning of all time periods for the filing of postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying an opinion that appear in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced or distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************

# DONNA DUSO ET AL. *v.* TOWN OF GROTON
## (AC 46527)

Bright, C. J., and Alvord and Clark, Js.

*Syllabus*

The defendant town appealed from the trial court's judgment declaring that, pursuant to a pension agreement between the defendant and a police union, the plaintiffs, all retirees who formerly had been employed by the defendant, were entitled to the same deductible contribution payments to their health savings accounts as those received by the defendant's active employees. The defendant claimed, inter alia, that, in making its determination, the trial court misinterpreted the language of a collective bargaining agreement between the defendant and the union. The plaintiffs cross appealed from the trial court's judgment denying their motion for sanctions. *Held*:

The trial court had subject matter jurisdiction over the action because the plaintiffs satisfied the requirements for demonstrating standing, as it was clear that they were intended third-party beneficiaries of the pension agreement, and that their claims were ripe.

The trial court properly denied the defendant's motion to strike the complaint because the defendant failed to establish that the police union was a necessary party to the action.

The trial court correctly determined that the defendant's payment of a certain percentage of the annual deductible for its group health insurance plan to the health savings accounts of only its active employees contravened the terms of the pension agreement because the effect of such payments was that the plaintiffs did not receive the same nature and scope of health care coverage as the active employees.

The trial court did not abuse its discretion in awarding the plaintiffs damages, as the evidence supported the trial court's rejection of the defendant's request that it offset the award by the amount of the increase in health insurance premiums that the plaintiffs would have incurred had they received the deductible contributions to their health savings accounts.

The trial court did not abuse its discretion in declining to award attorney's fees to the plaintiffs as a sanction for the defendant's alleged bad faith litigation conduct because the court reasonably could have determined that the plaintiffs failed to prove that the claims raised in the defendant's motion to dismiss were entirely without color and that the defendant had acted in bad faith.

Argued May 29—officially released October 1, 2024

*Procedural History*

Action seeking, inter alia, a declaratory judgment as to the scope of a certain provision of a pension agreement as it related to the defendant's obligations in connection with the health care coverage provisions of a collective bargaining agreement, and for other relief, brought to the Superior Court in the judicial district of New London, where the court, *Swienton, J.*, denied the defendant's motion to dismiss; thereafter, the court, *Swienton, J.*, denied the plaintiffs' motion for sanctions; subsequently, the court, *Swienton, J.*, denied the defendant's motion to strike; thereafter, the court, *Graff, J.*, adopted the parties' joint stipulation of facts and rendered judgment for the plaintiffs; subsequently, the court, *Graff, J.*, awarded compensatory damages to the plaintiffs, and the defendant appealed and the plaintiffs cross appealed to this court. *Affirmed.*

*Kyle J. Zrenda*, with whom was *Kristi D. Kelly*, for the appellant-cross appellee (defendant).

*Jacques J. Parenteau*, for the appellees-cross appellants (plaintiffs).

*Opinion*

BRIGHT, C. J. In this declaratory judgment action, the defendant, the town of Groton, appeals from the judgment of the trial court rendered in favor of the plaintiffs, Donna Duso, David Menard, James Gauthier, Kathleen Doyle, and Dexter Herron. On appeal, the defendant claims that the court (1) lacked subject matter jurisdiction over the declaratory judgment action because the plaintiffs lack standing and their claim is not ripe, (2) improperly denied the defendant's motion to strike the complaint because the plaintiffs had failed to join a necessary party, (3) misinterpreted the language of a collective bargaining agreement, and (4) improperly awarded damages. The plaintiffs cross

appeal from the judgment of the court denying their motion for sanctions. We affirm the judgment of the court.

The following facts, which were included in the parties' October 19, 2022 joint stipulation of facts (joint stipulation) and adopted by the trial court in its memorandum of decision, and procedural history are relevant to our resolution of this appeal. The plaintiffs are former employees of the defendant and "were represented by a duly elected collective bargaining representative, the Groton Police Union, Local 3428 of Council 15, or Council 4 as successor in interest to Council 15, of AFSCME, AFL-CIO (union). . . . Throughout the course of all [of] the plaintiffs' employment, and in accordance with [the Municipal Employee Relations Act (MERA), General Statutes § 7-467 et seq.], the [defendant] and the union collectively bargained the terms and conditions of the plaintiffs' employment whereby entering into a series of written collective bargaining agreements every few years, each typically covering a time period from two (2) to four (4) years, depending on what the parties thereto (i.e., the [defendant] and the union) agreed upon."

Each of the plaintiffs has retired from their employment with the defendant. "Different collective bargaining agreements were in effect at the time each particular plaintiff retired from employment . . . . Each collective bargaining agreement in effect at the time of any of the plaintiffs' retirement incorporated into it the same collectively bargained pension agreement: An Agreement Between the Town of Groton and the Groton Police Union, Local 3428 of Council 15 AFSCME Concerning Pensions August 1, 2008–June 30, 2012 (pension agreement), which pension agreement remains in effect to the present date. . . . The [defendant] and the union entered into the collective bargaining agreement that is the subject of this declaratory judgment action,

namely, the Agreement Between The Town of Groton and The Groton Police Union Local #3428 Council 4, AFSCME, AFL-CIO July 1, 2016–June 30, 2020 (CBA), which CBA was ratified by the parties on or about November 28, 2017, and which CBA incorporates the pension agreement under its article 25. . . .

"At all times relevant to the plaintiffs' complaint, the [defendant] self-insures its group health insurance benefits. . . . Anthem Blue Cross/Blue Shield (Anthem), through an administrative services contract with the [defendant], administers the benefits on the [defendant's] behalf. . . . As a town offering self-insured health benefits to its employees and retirees, the [defendant] does not pay any portion of a 'premium' to Anthem but is billed by Anthem for the total cost of all claims made by active employees and retirees for health insurance benefits together with an administrative fee collected by Anthem, as the administrator." (Footnotes omitted.)

"During their employment, all five . . . plaintiffs participated in the [defendant's] group health insurance, which at that time was a preferred provider option (PPO) plan design as the primary option, with the option to elect participation in a high deductible health plan (HDHP) design as an alternative." "Under the various PPO plans offered to both active employees and retirees between July, 2013, through June, 2018, there was no annual deductible for in-network medical services, but there were deductibles applicable to out-of-network medical services. . . . Prior to January, 2018, the [defendant] did not contribute any amount of money to any active employee or retiree in relation to any deductible amount associated with either the PPOs or HDHPs offered to employees." (Citations omitted.)

"In 2018, pursuant to article 22.1 of the CBA . . . the [defendant] changed its group health insurance plan

design for active police officers from a managed care PPO to an HDHP. . . . Active employees enrolled in the [defendant's] health insurance were moved from the PPO to the HDHP effective January 1, 2018; retirees, to include the plaintiffs, were required to enroll in the HDHP no later than July 1, 2018. . . . All plaintiffs, as retirees, enrolled in the HDHP effective July 1, 2018. . . .

"Section 16 of the pension agreement articulates the terms and conditions on which retirees . . . may elect coverage under the [defendant's] group health insurance plan. . . . Section 16 (C) and (D) of the pension agreement articulate the scope of health insurance coverage available to retirees, depending on age, and § 16 (F) of [the pension agreement] provides the premium share percentages that retirees . . . are to pay for participation in the [defendant's] health insurance plan. . . . For retirees under the age of sixty-five, which includes all of the plaintiffs, the scope of coverage is as follows . . . . The nature and scope of coverages, including but not limited to deductibles, coinsurance, copays and/or limits, shall be those in effect for active police officers, as those coverages, including but not limited to deductibles, coinsurance, copays and/or limits, may change from time to time, except dental which, if provided to active police officers, shall be limited for retirees, spouses and/or other dependents, where applicable, to basic coverage as provided to active police officers. Said coverages shall be available until such time as the retiree, spouse and/or dependents become eligible for Medicare or reach age sixty-five, whichever is earlier." (Internal quotation marks omitted.)

"Participants in an HDHP are eligible under the Internal Revenue Code [26 U.S.C.] § 223, to open and maintain a tax favored health savings account (HSA). . . . Enrollment in an HDHP does not require a participant

to open an HSA, but the HDHP participant has the option to do so. . . . Article 22.1 (A) (2) of the CBA expressly requires that active employees open and maintain an HSA in conjunction with their enrollment in the HDHP. . . . There is no requirement that any retiree . . . open and maintain an HSA in conjunction with the HDHP; but retirees, including the plaintiffs, may have that option. . . . An HSA is a personally established and owned private bank account that a participant opens and maintains at a bank of their choosing. . . . Similar to the procedures for 'direct deposit' for payment of regular wages (active employees) or monthly pension payments (retirees), an individual provides the [defendant] with a 'direct deposit' authorization form for payment of any funds the individual wishes to have withheld from their wages/payments and directed to their HSA. . . . The [defendant] deducts the respective share of the health insurance premiums for active employees from the employee's wages during each payroll, and from retirees once per month from their monthly pension payment. . . .

"Article 22.1 (A) (2) of the CBA provides for an annual contribution to active employees' HSA, by the [defendant], equal to [50 percent] of the active employee's annual in-network deductible. . . . Under article 22.1 (A) (2), therefore, active employees purchasing 'single' coverage receive a $1000 contribution from the [defendant] to their HSA each July 1, and active employees purchasing 'two-person' or 'family' coverage receive a $2000 contribution from the [defendant] to their HSA each July 1. . . . Under the CBA, commencing on July 1, 2018, and each year since, active employees enrolled in the HDHP have received . . . contributions by the [defendant] to their respective HSA . . . ." (Footnote omitted.) Active employees with single coverage for the years 2018, 2019, 2020, 2021, and 2022, received $1000

per year. Active employees with two person/family coverage for the years 2018, 2019, 2020, 2021, and 2022, received $2000 per year.

Article 22.1 (A) (2) of the CBA contains a "Note," stating: "The [defendant's] fifty percent (50%) contribution toward the funding of the HDHP plan is not an element of the underlying insurance plan, but rather relates to the manner in which the deductible shall be funded for active employees. The [defendant] shall have no obligation to fund any portion of the HDHP deductible for retirees or other individuals upon their separation from employment. Under 65 retirees must enroll in the HDHP as of July 1, 2017, or as soon as legally possible following the ratification of this 2016–2020 agreement, but in no case later than July 1, 2018." (Emphasis omitted.)

"Prior to 2016, the [defendant] used what is referred to [as] a 'Fully-Insured Equivalent Rate' to determine participant cost shares; but, in February of 2016, the [defendant] commenced using what is referred to as an 'Allocated Rate' to determine participant cost share. This resulted in participants being charged a percentage of a lower rate for health insurance benefits. Both the 'Fully-Insured Equivalent Rate' and the 'Allocated Rate' used by the [defendant] to determine participant cost share each year [are] calculation[s] provided by Anthem to the [defendant]. . . . Neither the Fully-Insured [Equivalent] Rate, nor the Allocated Rate remains stagnant; it changes from fiscal year to fiscal year. . . . The Fully-Insured [Equivalent] Rate and/or the Allocated Rate are both alternative terms which may be used interchangeably with the word 'premium,' as that phrase is used in the CBA and pension agreement. . . . The Allocated Rate is derived through an underwriting calculation performed by Anthem and provided to the [defendant] prior to the start of its fiscal year. The underwriting calculation takes into account certain cost

estimates including but not limited to the potential or anticipated claims attributable to the particular group of participants, Anthem's retention fees, potential stop loss fees, and network access fees."

"[I]n plan years 2016 and 2017, under the PPO plan and prior to the move to the HDHP, the Allocated Rate for the active police officers and retirees was the same amount. Following the move of all active police officers and retirees from the PPO plan to the HDHP in 2018, the Allocated Rate for the active police officers, compared to the Allocated Rate for the retirees, in each of the 'Single,' 'Two-Person' and 'Family' categories is approximately 6.5 percent more for active police officers in each of the fiscal years listed. The explanation for this difference is . . . as follows: 'The Allocated Rate, per Anthem, is adjusted (increased) to account for a reduction in consumerism on the part of the participants who receive financial funding to their [HSAs] from their employer.[1] The percentage of the upward adjustment in the base Allocated Rate for such participants is dependent on the financial benefit paid by the employer to the participant.' " (Footnote added.)

The plaintiffs commenced the present action in November, 2018. In the operative amended complaint, dated February 16, 2023,[2] the plaintiffs alleged that,

[1] "[A] reduction in consumerism" appears to refer to the economic theory that health insurance creates a moral hazard in that insureds who receive funding from others toward their health care expenditures will be more likely to consume health care services and will be less discriminating consumers than insureds who must spend their own funds for the same services. See, e.g., P. Molk, "The Ownership of Health Insurers," 2016 U. Ill. L. Rev. 873, 885 (2016) ("In health insurance, moral hazard is the phenomenon where individuals consume more medical services when they are insured than when they are uninsured, because insurance reduces the policyholder's marginal cost of consuming healthcare. . . . This socially-inefficient consumption raises the price of health insurance and contributes to the country's health costs." (Footnote omitted.)).

[2] The amended complaint was attached to a request for leave to amend the complaint, which sought to add the following allegation: "The [defendant] and the union entered into a new collective bargaining agreement for the

following the adoption of the CBA, the defendant failed to provide them with the "nature and scope of coverages . . . in effect for active police officers," in violation of § 16 of the pension agreement. (Internal quotation marks omitted.) Specifically, the plaintiffs alleged that "retirees who are mandated to enroll in the HDHP plan are incurring $1000 for individuals and $2000 for families in deductible contribution expenses that are not being incurred by active employees because the defendant is making a 50 percent contribution of the deductible amount to the HSA." The plaintiffs alleged that the effect of the HDHP/HSA is that the premium is lower for each active employee. The plaintiffs further alleged that, "[b]ecause the payment of a higher deductible in order to reduce the individual employee's premium is a significant element of the underlying insurance plan," the plaintiffs were not receiving the "nature and scope of coverages . . . in effect for active police officers," as required by the pension agreement. (Internal quotation marks omitted.)

The plaintiffs sought a declaratory judgment that, "under the terms of the pension agreement, the 'nature and scope' of the coverage for active police officers includes a requirement that the defendant contribute 50 percent of the deductible amount to the plaintiffs'

period commencing July 1, 2020–June 30, 2023, which did not alter the health insurance plan design provided to active employees or the [defendant's] contribution to the active employees' HSA[s]. The 'Note' contained in the subject CBA, expressly indicating that the HSA contribution does not apply to retirees, is also contained verbatim in the new agreement. The percentage of the Allocated Rate that active employees pay for their insurance was, however, amended and is set forth in article 22.2 of the new agreement." Following the request for leave to amend, the defendant filed an answer to the amended complaint, in which it admitted the additional allegation. In its May 2, 2023 order granting the plaintiffs' request for a mandatory injunction and awarding damages, the court noted that the defendant had not objected to the request to amend and ordered the defendant to continue payment of the HSA contributions through the effective date of the then current CBA.

[HSAs] on a pretax or taxable basis based on the plaintiffs' eligibility to maintain [an HSA]." The plaintiffs additionally sought a mandatory injunction requiring the defendant to pay the deductible amounts to the plaintiffs for the period covered by the CBAs, and attorney's fees and costs. The plaintiffs also sought "[s]uch further legal and equitable relief as the court deems appropriate, including an injunction mandating the payment of sums to fund deductibles . . . ."

The defendant filed motions to dismiss and to strike the plaintiffs' complaint, which were both denied. In its answer, the defendant asserted the following special defenses: the plaintiffs were not third-party beneficiaries of the CBA, the plaintiffs lacked standing, the plaintiffs lacked the irreparable harm and inadequate remedy at law necessary for injunctive relief, and the plaintiffs' request for attorney's fees was barred by the American rule.[3]

In lieu of a court trial involving the testimony of witnesses, the parties submitted the case to the court for resolution on the basis of the joint stipulation, agreed upon exhibits, and memoranda of law. On November 28, 2022, the court, *Graff, J.*, issued its memorandum of decision. After first rejecting the defendant's claim that the plaintiffs lacked standing, the court turned to the merits of the dispute over the terms of the CBA and the pension agreement. The court found the language of the pension agreement to be clear and unambiguous. The court noted that "nature and scope,"

---

[3] "Connecticut adheres to the American rule . . . [which reflects the idea that] in the absence of statutory or contractual authority to the contrary, a successful party is not entitled to recover attorney's fees or other ordinary expenses and burdens of litigation . . . . Despite the general rule, our Supreme Court has recognized exceptions for cases in which the party or its counsel has acted in bad faith . . . and for cases in which attorney's fees are assessed as punitive damages." (Citation omitted; internal quotation marks omitted.) *Palmieri* v. *Cirino*, 226 Conn. App. 431, 438–39, 318 A.3d 440 (2024).

as used in the pension agreement, are not defined terms and consulted dictionary definitions to interpret " 'nature and scope of coverages' " to mean that the "essence and extent of the coverages shall be those in effect for active police officers." Because "coverage" is defined by the pension agreement to include deductibles, the court stated that § 16 of the pension agreement means that "active police officers and retirees shall have the same coverage, which includes deductibles."

The court found that the note contained in article 22.1 (A) (2) of the CBA, pursuant to which the defendant would have no obligation to fund any portion of the HDHP deductible for retirees, contravened the terms of the pension agreement, in that it required the retirees to pay all of the deductible, whereas active police officers paid only one half of the deductible. The court stated: "The funding of the deductible is part of the essence of the deductible. Indeed, how much a deductible is and who pays for the deductible are two of the most important aspects of a deductible. By virtue of article 22, the defendant is paying health insurance claims for active police officers by paying [50 percent] of the active police officers' deductibles. The plaintiffs are not receiving this same treatment. Even setting aside the issue of funding, the court is hard pressed to find that the plaintiffs and the active police officers have the same deductibles. While on paper this may be true, in reality the active police officers are paying $1000 for individuals and $2000 for families while retirees are paying $2000 for individuals and $4000 for families."

Accordingly, the court determined that the plaintiffs were entitled to the same deductible contribution payments as active employees. The court ordered the parties to submit briefs addressing damages, including "what, if any, deductible amounts each of the plaintiffs are entitled to recover," and the plaintiffs' request for attorney's fees and costs. On December 16, 2022, the

defendant filed a motion to reargue, which the court denied.

On January 27, 2023, the parties filed briefs addressing damages and attorney's fees. The plaintiffs argued that they were entitled to prejudgment interest and attorney's fees in addition to HSA contributions for five years beginning in 2018. Specifically, they contended that they were collectively owed contributions in the total amount of $36,000. In its brief, the defendant opposed the plaintiffs' request for a mandatory injunction, argued that it was entitled to an offset from the plaintiffs' claimed damages in an amount equal to the difference in the Allocated Rate active employees paid and the lower rate the plaintiffs paid, and objected to the plaintiffs' request for attorney's fees. The defendant did not address the plaintiffs' request for prejudgment interest. A hearing was held on February 16, 2023. In its May 2, 2023 order, the court awarded compensatory damages in the amount requested by the plaintiffs and declined to award attorney's fees or prejudgment interest. This appeal and cross appeal followed. Additional facts and procedural history will be set forth as necessary.

I

The defendant first challenges the subject matter jurisdiction of the trial court on the basis that the plaintiffs' claim is not justiciable. First, the defendant contends that the plaintiffs lack standing to assert their claim. Second, it argues that "[t]he plaintiffs' prospective claim for an injunction and declaratory judgment is not ripe because they have not alleged or proffered evidence that they will, or are even likely to, need to pay monies toward the deductible." Because these claims are interrelated, we discuss them together. We conclude that the court had subject matter jurisdiction over the action.

The following additional procedural history is relevant. On January 22, 2019, the defendant filed a motion to dismiss the plaintiffs' complaint, alleging in relevant part that the court lacked subject matter jurisdiction. Specifically, the defendant argued: "(1) the plaintiffs lack legal standing to enforce the terms of the [CBA]; (2) the plaintiffs have failed to exhaust their administrative remedies by failing to bring their cause of action before the Connecticut State Board of Labor Relations . . . (3) the plaintiffs have failed to exhaust their administrative remedies by failing to exercise contractual grievance rights set forth in the [CBA]; (4) an injunction action fails for lack of joinder of a necessary and indispensable party, namely [the union]; and (5) the plaintiffs fail[ed] to allege an inadequate remedy at law and irreparable harm in order to maintain an injunction action." The plaintiffs filed a memorandum of law in opposition to the defendant's motion, in which they argued that (1) they have standing as third-party beneficiaries pursuant to the terms of the pension agreement, (2) the administrative remedies suggested by the defendant were not available to the plaintiffs as former members of the union, (3) even if the union were a necessary or indispensable party, that would not implicate the court's subject matter jurisdiction, and (4) whether the plaintiffs are entitled to injunctive relief does not implicate subject matter jurisdiction. The defendant filed a reply brief, and the court, *Swienton, J.*, held argument on August 12, 2019.

In its November 12, 2019 memorandum of decision, the court denied the motion to dismiss, determining, inter alia, that, "because the plaintiffs allege that they are each former full-time employees of the defendant who each retired prior to the adoption of the [CBA], the plaintiffs have alleged sufficient facts that demonstrate that they are not parties to the [CBA] and have no duty to exhaust arbitration procedures required by the [CBA]

before bringing a direct action against their employer."[4] In its posttrial brief, the defendant reiterated its contention that the plaintiffs lack standing, arguing that the plaintiffs are not third-party beneficiaries to the CBA, which argument the court rejected in its November 28, 2022 memorandum of decision.

We begin our analysis with our standard of review and relevant legal principles regarding justiciability. "An issue regarding justiciability, which must be resolved as a threshold matter because it implicates this court's subject matter jurisdiction . . . raises a question of law. When . . . the trial court draws conclusions of law, our review is plenary and we must decide whether its conclusions are legally and logically correct and find support in the facts that appear in the record." (Citation omitted; internal quotation marks omitted.) *Milford Power Co.*, *LLC* v. *Alstom Power*, *Inc.*, 263 Conn. 616, 624, 822 A.2d 196 (2003).

"Justiciability comprises several related doctrines, namely, standing, ripeness, mootness and the political question doctrine, that implicate a court's subject matter jurisdiction and its competency to adjudicate a particular matter. . . . Because courts are established to resolve actual controversies, before a claimed controversy is entitled to a resolution on the merits it must be justiciable. . . . Justiciability requires (1) that there be an actual controversy between or among the parties to the dispute . . . (2) that the interests of the parties be adverse . . . (3) that the matter in controversy be capable of being adjudicated by judicial power . . . and (4) that the determination of the controversy will result in practical relief to the complainant. . . .

"The declaratory judgment procedure, governed by [General Statutes] § 52-29 and Practice Book § 17-54 et

---

[4] The defendant filed a motion to reargue the court's denial of its motion to dismiss, which the court denied.

seq., does not relieve the plaintiff from justiciability requirements. A declaratory judgment action pursuant to § 52-29 . . . provides a valuable tool by which litigants may resolve uncertainty of legal obligations. . . . The [declaratory judgment] procedure has the distinct advantage of affording to the court in granting any relief consequential to its determination of rights the opportunity of tailoring that relief to the particular circumstances. . . . A declaratory judgment action is not, however, a procedural panacea for use on all occasions, but, rather, is limited to solving justiciable controversies. . . . Invoking § 52-29 does not create jurisdiction where it would not otherwise exist." (Citations omitted; internal quotation marks omitted.) *Mendillo* v. *Tinley, Renehan & Dost, LLP*, 329 Conn. 515, 523–24, 187 A.3d 1154 (2018).

The defendant in the present case claims that the trial court lacked subject matter jurisdiction on the basis that the plaintiffs failed to satisfy the related requirements of standing and ripeness. "Standing is the legal right to set judicial machinery in motion. One cannot rightfully invoke the jurisdiction of the court unless he [or she] has, in an individual or representative capacity, some real interest in the cause of action, or a legal or equitable right, title or interest in the subject matter of the controversy. . . . When standing is put in issue, the question is whether the person whose standing is challenged is a proper party to request an adjudication of the issue . . . . Standing requires no more than a colorable claim of injury; a [party] ordinarily establishes . . . standing by allegations of injury [that he or she has suffered or is likely to suffer]. Similarly, standing exists to attempt to vindicate arguably protected interests. . . .

"Standing is established by showing that the party claiming it is authorized by statute to bring suit or is classically aggrieved. . . . The fundamental test for

determining [classical] aggrievement encompasses a well-settled twofold determination: first, the party claiming aggrievement must successfully demonstrate a specific, personal and legal interest in [the subject matter of the challenged action], as distinguished from a general interest, such as is the concern of all members of the community as a whole. Second, the party claiming aggrievement must successfully establish that this specific personal and legal interest has been specially and injuriously affected by the [challenged action]. . . . Aggrievement is established if there is a possibility, as distinguished from a certainty, that some legally protected interest . . . has been adversely affected." (Internal quotation marks omitted.) *Browning* v. *Van Brunt DuBiago & Co., LLC*, 330 Conn. 447, 455, 195 A.3d 1123 (2018).

"[T]he rationale behind the ripeness requirement is to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements . . . . Accordingly, in determining whether a case is ripe, a trial court must be satisfied that the case before [it] does not present a hypothetical injury or a claim contingent upon some event that has not and indeed may never transpire. . . . [I]n determining whether a court has subject matter jurisdiction, every presumption favoring jurisdiction should be indulged." (Citation omitted; internal quotation marks omitted.) *Pringle* v. *Pattis*, 212 Conn. App. 736, 742–43, 276 A.3d 1042 (2022).

On appeal, the defendant argues that the plaintiffs lack standing because (1) "they have failed to allege or provide any evidence that they have sustained an injury in fact," and (2) "they seek benefits as third-party beneficiaries beyond what is provided in the CBA." The defendant relatedly argues that the plaintiffs' claims are not ripe because "they have not alleged or proffered evidence that they will, or are even likely to, need to

pay monies toward the deductible. Thus, the arguments as to ripeness are the same as those concerning injury in fact . . . ." We are not persuaded.

"The legal remedies of a pensioner are not wholly prescribed by the collective bargaining agreement itself but by standard contractual principles, including promissory estoppel and third party beneficiary principles." *Flynn* v. *Newington*, 2 Conn. App. 230, 237, 477 A.2d 1028, cert. denied, 194 Conn. 804, 482 A.2d 709 (1984). "A third party beneficiary may enforce a contractual obligation without being in privity with the actual parties to the contract. . . . Therefore, a third party beneficiary who is not a named obligee in a given contract may sue the obligor for breach. . . . [T]he ultimate test to be applied [in determining whether a person has a right of action as a third party beneficiary] is whether the intent of the parties to the contract was that the promisor should assume a direct obligation to the third party [beneficiary] . . . ." (Footnote omitted; internal quotation marks omitted.) *Wilcox* v. *Webster Ins.*, *Inc.*, 294 Conn. 206, 217, 982 A.2d 1053 (2009).

It is clear from the plain language of the pension agreement that the plaintiffs are intended third-party beneficiaries. Section 16 (C) of the pension agreement explicitly provides that the defendant is required to provide the plaintiffs with the same "nature and scope" of health care coverage that it provides to active employees. Nevertheless, the defendant argues that, although "the plaintiffs are third-party beneficiaries to the CBA in that they are contemplated beneficiaries of the pension provisions and health care coverage, the benefits they seek to vindicate are well outside the scope of those contemplated." (Emphasis omitted.) As support for this argument, the defendant analogizes the HSA contributions to a shoe allowance provided to active employees, for which the retirees would not "have standing to make a claim . . . ."

Although the defendant frames this argument as challenging subject matter jurisdiction, we do not view it as such. We view it, instead, as directed toward the merits of the present declaratory judgment action. The plaintiffs, as third-party beneficiaries, have standing to allege that the disparate funding of the health care deductible between the plaintiffs and the defendant's active employees constitutes a breach of the defendant's obligation under § 16 of the pension agreement, regardless of how that question is resolved on the merits. See *Payne* v. *TK Auto Wholesalers*, 98 Conn. App. 533, 538, 911 A.2d 747 (2006) ("The question of standing does not involve an inquiry into the merits of the case. . . . It merely requires allegations of a colorable claim of injury to an interest that is arguably protected by [a] statute or common law." (Internal quotation marks omitted.)). Accordingly, we reject this basis for the defendant's argument that the plaintiffs lacked standing.

With respect to the second prong of the aggrievement test and the defendant's related contention that the plaintiffs' claims are not ripe, the defendant maintains that the plaintiffs failed to allege that they have sustained an injury in fact because they did not allege that they have paid funds toward their deductibles. We are not persuaded that the absence of such allegations necessitates the conclusion that the plaintiffs' interest has not been specially affected or that the case presents a hypothetical injury. Moreover, "a party ordinarily establishes standing by alleging an injury [that] he has suffered *or is likely to suffer* . . . ." (Emphasis in original; internal quotation marks omitted.) *Wilcox* v. *Webster Ins.*, *Inc.*, supra, 294 Conn. 218–19 n.17. Thus, we are persuaded by the plaintiffs' argument that "it makes no difference if the plaintiffs were actually out of pocket for the payment of medical expenses covered by the deductible because it is likely that each would require

some form of medical care or prescription payments during the 365 days covered by the deductible payment that was not made." Consequently, the plaintiffs have alleged that their interests in the pension agreement have been injuriously affected by the defendant's failure to pay 50 percent of the deductible as a contribution to their HSAs.

Indulging every presumption in favor of jurisdiction, we conclude that the plaintiffs have satisfied the requirements for demonstrating standing and that their claims are ripe. Accordingly, we conclude that the trial court had subject matter jurisdiction over the action.

## II

The defendant next claims that the court improperly denied its motion to strike because the plaintiffs failed to join the union as a necessary party. We are not persuaded.

The following additional procedural history is relevant to our resolution of this claim. On May 6, 2021, the defendant filed a motion to strike the plaintiffs' complaint, alleging, in relevant part, that the complaint was legally insufficient because of the absence of a necessary party, the union.[5] The plaintiffs objected to the motion to strike, and the court, *Swienton, J.*, heard argument on September 21, 2021. In its September 29, 2021 order, the court denied the defendant's motion. The court found meritless the defendant's argument that the union was a necessary party to the action to determine the plaintiffs' rights as third-party beneficiaries to the pension agreement. The court reasoned that "[t]he entire controversy is between the [defendant] and the [plaintiffs] who claim, as third-party beneficiaries, that they are entitled to receive certain benefits in

---

[5] The defendant previously had raised the issue of nonjoinder in a motion to dismiss the plaintiffs' complaint, but it later withdrew that basis for its motion to dismiss.

the same manner as the 'active' police officers." The court determined that it could "proceed to a decree without affecting any rights of the union."

We begin by setting forth the relevant legal principles and standard of review. "Necessary parties . . . are those [p]ersons having an interest in the controversy, and who ought to be made parties, in order that the court may act on that rule which requires it to decide on, and finally determine the entire controversy, and do complete justice, by adjusting all the rights involved in it. . . . [B]ut if their interests are separable from those of the parties before the court, so that the court can proceed to a decree, and do complete and final justice, without affecting other persons not before the court, the latter are not indispensable parties." (Internal quotation marks omitted.) *Garden Homes Profit Sharing Trust, L.P.* v. *Cyr*, 189 Conn. App. 75, 82 n.4, 206 A.3d 230 (2019). "Practice Book §§ 10-39 and 11-3 . . . provide that a party's exclusive remedy for nonjoinder or for misjoinder of parties is by the filing of a motion to strike." (Emphasis omitted; footnotes omitted.) *Izzo* v. *Quinn*, 170 Conn. App. 631, 640, 155 A.3d 315 (2017). "A motion to strike attacks the legal sufficiency of the allegations in a pleading. . . . In reviewing the sufficiency of the allegations in a complaint, courts are to assume the truth of the facts pleaded therein and to determine whether those facts establish a valid cause of action. . . . Because a motion to strike challenges the legal sufficiency of a pleading, and, consequently, requires no factual findings by the trial court, our review of the court's ruling on [a motion to strike] is plenary." (Internal quotation marks omitted.) *Pelletier Mechanical Services, LLC* v. *G & W Management, Inc.*, 162 Conn. App. 294, 300, 131 A.3d 1189, cert. denied, 320 Conn. 932, 134 A.3d 622 (2016).

The defendant's principal argument in support of its claim that the union was a necessary party is that the

plaintiffs sought "a reformation of the CBA, and the trial court has granted that relief, effectively striking the note in article [22.1 (A) (2)] of the CBA." According to the defendant, the union was a necessary party to the effective reformation of the contract. We are not persuaded that the present action involved a reformation of the CBA agreement such that the union was a necessary party. To the contrary, the present action required the trial court to interpret the benefits provided in the pension agreement in relation to the benefits provided in the CBA to active employees. The judgment rendered by the trial court did not adjust the rights of the active employees in the union.

The defendant also argues that the collective bargaining process "involves the sacrifice of certain positions in negotiation but not others. The inclusion of HSA contributions for active employees demonstrates that those provisions *may be of significant importance* to the union. A declaratory judgment adverse to the [defendant] in this case would have the effect of materially increasing the cost of that benefit, making it more difficult to bargain for in future CBAs." (Emphasis added.) Initially, we note that this argument is being raised for the first time on appeal. The defendant did not argue in support of its motion to strike that a possible impact on future negotiations constituted a sufficiently concrete interest that made the union a necessary party to this action. Furthermore, mere speculation as to the possible effect of the judgment on future negotiations is insufficient to compel the conclusion that the union's rights would be affected such that it is a necessary party to the action.[6] Accordingly, we conclude that the defendant failed to establish that the union was a necessary party to the action and the court

---

[6] There is nothing in the stipulated record that supports the defendant's assertion that the court's interpretation of the CBA would have any impact on future negotiations between the defendant and the union.

properly denied the defendant's motion to strike the complaint.

### III

The defendant's third claim is that the court incorrectly interpreted the language of the CBA to conclude that the defendant was contractually obligated, pursuant to § 16 (C) of the pension agreement, to contribute 50 percent of the deductible amount to the plaintiffs' HSAs. The defendant argues that "the trial court gave the term 'deductible' an overly broad interpretation, far beyond the word's ordinary meaning and usage, as well as the parties' expressed intent," in concluding that the definition of deductible included the manner in which the deductible is funded. We disagree.

We begin our analysis with the applicable standard of review and relevant legal principles regarding contract interpretation. "Principles of contract law guide our interpretation of collective bargaining agreements. . . . When, as in the present case, the trial court based its interpretation solely on the language of the contract, our standard of review is plenary." (Internal quotation marks omitted.) *Gallagher* v. *Fairfield*, 339 Conn. 801, 807, 262 A.3d 742 (2021). "The intent of the parties as expressed in a contract is determined from the language used interpreted in the light of the situation of the parties and the circumstances connected with the transaction. . . . [T]he intent of the parties is to be ascertained by a fair and reasonable construction of the written words and . . . the language used must be accorded its common, natural, and ordinary meaning and usage where it can be sensibly applied to the subject matter of the contract. . . . Where the language of the contract is clear and unambiguous, the contract is to be given effect according to its terms. A court will not torture words to import ambiguity where the ordinary meaning leaves no room for ambiguity . . . . Similarly,

any ambiguity in a contract must emanate from the language used in the contract rather than from one party's subjective perception of the terms." (Internal quotation marks omitted.) *Honulik* v. *Greenwich*, 293 Conn. 698, 710, 980 A.2d 880 (2009).

With respect to the defendant's obligation to provide the plaintiffs with health care insurance, § 16 (C) of the pension agreement provides in relevant part: "The nature and scope of coverages, including but not limited to deductibles, co-insurance, co-pays and/or limits, shall be those in effect for active Police Officers, as those coverages, including but not limited to deductibles, co-insurance, co-pays and/or limits, may change from time to time . . . ." As noted previously, because "nature and scope" are not defined in the pension agreement, the court appropriately consulted dictionary definitions to interpret "nature and scope of coverages" to mean that the "essence and extent of the coverages shall be those in effect for active police officers." See *Garcia* v. *Hartford*, 292 Conn. 334, 345, 972 A.2d 706 (2009) ("[w]e ordinarily look to the dictionary definition of a word to ascertain its commonly approved usage").

The court determined that "[c]overage is defined by the CBA to include deductibles. Thus, § 16 (C) of the pension agreement means that active police officers and retirees shall have the same coverage, which includes deductibles." The court went on to determine whether active employees and retirees had the same deductible, in light of the defendant's 50 percent funding of the active employees' deductibles by way of contributions to their HSAs. The court concluded that "[t]he funding of the deductible is part of the essence of the deductible. Indeed, how much a deductible is and who pays for the deductible are two of the most important aspects of a deductible. By virtue of article 22 [of the CBA], the defendant is paying health insurance claims for active police officers by paying [50 percent] of the active police

officers' deductibles. The plaintiffs are not receiving this same treatment. Even setting aside the issue of funding, the court is hard pressed to find that the plaintiffs and the active police officers have the same deductibles. While on paper this may be true, in reality the active police officers are paying $1000 for individuals and $2000 for families while retirees are paying $2000 for individuals and $4000 for families." Accordingly, the court concluded that, by failing to pay 50 percent of the deductible as contributions to the HSAs of the plaintiffs, the defendant breached its obligation to provide them with coverage of the same nature and scope that it provided to active employees.

On appeal, the defendant argues that "HSA contributions, or in-kind payments made to active employees under the CBA, do not constitute 'coverage' or the 'deductible' for four principal reasons: (1) Such a construction unreasonably broadens the plain meanings of these terms; (2) such a conclusion fails to interpret the pension agreement in its proper context as one part of the larger CBA; (3) such an expansive interpretation contravenes the manner in which the federal government regulates HSAs; and (4) such a determination is at odds with sister state court decisions." We examine each argument in turn.

The defendant's first argument requires that we construe the term deductible as used in the pension agreement. "We often consult dictionaries in interpreting contracts . . . to determine whether the ordinary meanings of the words used therein are plain and unambiguous, or conversely, have varying definitions in common parlance." (Internal quotation marks omitted.) *Centerplan Construction Co., LLC* v. *Hartford*, 343 Conn. 368, 396–97, 274 A.3d 51 (2022). Black's Law Dictionary (9th Ed. 2009) p. 475, defines "deductible" as, "[u]nder an insurance policy, the portion of the loss to be borne by the insured before the insurer becomes

liable for payment." This common usage of the term is consistent with the definition set forth in General Statutes § 17b-290 (7), and relied on by our Supreme Court in *NEMS, PLLC* v. *Harvard Pilgrim Health Care of Connecticut, Inc.*,      Conn.     ,     ,      A.3d (2024), which provides that " '[d]eductible' means the amount of out-of-pocket expenses that would be paid for health services on behalf of a member before becoming payable by the insurer . . . ." General Statutes § 17b-290 (7).

We agree with the trial court both that the relevant provision of the pension agreement is unambiguous and that it precludes the defendant from contributing 50 percent of the deductible to active employees' HSAs without making the same contribution to the plaintiffs' HSAs. In other words, the defendant's failure to pay 50 percent of the deductible as a contribution to the plaintiffs' HSAs resulted in the plaintiffs effectively having different deductibles and a different "nature and scope" of coverage from active employees, in contravention of the terms of the pension agreement. Because active employees in effect were obligated to pay only $1000 for individuals or $2000 for families before the defendant, the self-insured employer, begins paying their claims, the active employees' deductibles were less than those of the plaintiffs.

The defendant maintains, however, that the plaintiffs and active employees have the same deductible because the deductible does not include "the source by which the deductible is paid."[7] In support of this contention,

---

[7] The defendant argues: "These definitions are wholly untethered from the source by which the deductible is paid. The most obvious reason for this is that a deductible exists even if it never needs to be paid. If a person has an insurance plan with a deductible but never makes a claim against the insurance plan, and thus never has need to pay or fund the deductible, the insurance coverage nonetheless has a deductible. If the essence of a deductible is the source by which it is paid, as the trial court held, it could not exist if it does not need to be paid. This is at odds [with] the ordinary usage of the term 'deductible.' Virtually every insured person whose coverage

the defendant argues that a contrary interpretation of the term deductible would mean that, "if the union negotiated an increase in salaries, overtime pay, or shoe allowances to offset rising deductibles, retirees, who undeniably have no right to such things under the CBA, would be able to claim those same cash payments as part of the deductible's funding." We disagree. The defendant did not elect to indirectly compensate its current employees to cover higher employee health care costs by way of any of those unrelated benefits but, rather, negotiated article 22.1 (A) (2) of the CBA to specifically describe the HSA contribution as a "fifty percent . . . contribution toward the funding of the HDHP plan . . . ." (Emphasis omitted.) The hypotheticals the defendant posits simply are not before us. What is before us is a plan by which the defendant expressly reduced the deductible of its current employees by 50 percent but did not do the same for the plaintiffs. Thus, the payment of 50 percent of the deductible as a contribution to an HSA is distinct from other possible benefits that the defendant could have negotiated that would be untethered to the employees' health care insurance.

Furthermore, when, as in the present case, the employer is also the insurer, there is little difference between whether the defendant provides its employees with a lower deductible or funds a portion of the deductible. As previously noted in this opinion, a deductible "means the amount of out-of-pocket expenses that would be paid for health services on behalf of a member before becoming payable by the insurer . . . ." General Statutes § 17b-290 (7). The defendant, as a self-insured employer, in effect bears the first $1000 or $2000 of its current employees' health care costs *before* the employees become responsible for any costs when it deposits one half of the deductible amount in each employee's

includes a deductible would acknowledge its existence regardless of whether a claim against their insurance policy had ever been made."

HSA. Thus, the deductible for which the defendant's current employees actually are responsible is 50 percent of that for which the plaintiffs are responsible.

Finally, the defendant's argument ignores the prefatory language of § 16 (C) of the pension agreement, on which the trial court relied. Section 16 (C) provides in relevant part: "*The nature and scope of coverages, including but not limited to* deductibles . . . shall be those in effect for active Police Officers . . . ." (Emphasis added.) This language is broad and expressly is not limited to the examples, including deductibles, set forth in § 16 (C). Thus, we agree with the trial court that the proper inquiry is whether the nature and scope, i.e., the "essence and extent of the coverages," are the same. Even if we were to agree with the defendant that how the deductible is funded is different than what the deductible is, there is no question that the nature or essence of the coverage the plaintiffs receive is less than that of active police officers.

The defendant's second argument is that the court failed to interpret the pension agreement in its proper context as one part of the larger CBA. Noting that the pension agreement was incorporated into the CBA, the defendant states that the defendant and the union had no reason to address the treatment of contributions to HSAs in the pension agreement because the defendant did not offer an HDHP until 2018. At that time, "the [defendant] and the union specifically considered whether a financial contribution to an HSA fell within the 'nature and scope of coverages' of a health insurance plan since they wrote into the CBA that such a financial contribution does not relate to the underlying plan but rather it relates to the funding of the plan for active employees."[8] Because the language of the pension

_____

[8] Although the defendant mentions article 19 of the pension agreement in the facts section of its principal appellate brief, it argues for the first time in its reply brief that the pension agreement was modified pursuant to article 19 of that agreement, which provides in relevant part that the

agreement is silent as to financial contributions to HSAs, the defendant contends that the CBA addressed a previously unaddressed issue.[9] The defendant additionally relies on general principles of contract interpretation to maintain that the terms of the pension agreement must be interpreted consistently with the CBA. The defendant contends that the court's findings that the HSA contribution is part of the deductible is "wholly inconsistent with" the note in article 22.1 (A) (2) of the CBA.[10]

pension agreement shall continue until a new agreement is signed by the parties and that negotiations must be in accordance with MERA. "It is a well established principle that arguments cannot be raised for the first time in a reply brief." (Internal quotation marks omitted.) *Houghtaling* v. *Commissioner of Correction*, 203 Conn. App. 246, 287, 248 A.3d 4 (2021). Consequently, we decline to consider this argument raised for the first time in the defendant's reply brief.

[9] The defendant cites *Gallagher* v. *Fairfield*, supra, 339 Conn. 812, in support of its argument. In *Gallagher*, a 1985 collective bargaining agreement (1985 CBA) provided that certain retired individuals would be entitled to town paid health insurance coverage. Id., 807–808. Federal law was amended thereafter to permit municipal employees to participate in Medicare. Id., 814. The question before our Supreme Court was whether the town, pursuant to a 2010 collective bargaining agreement, could terminate the retired plaintiff's private health insurance and provide him with comparable town paid Medicare supplemental insurance, while requiring him to pay the cost of his Medicare premiums. Id., 803–804, 808–809.

The court in *Gallagher* agreed with the trial court that the 1985 CBA did not preclude the town from terminating the plaintiff's private health insurance, so long as the town provided him with "substantially similar benefits in the form of supplemental Medicare coverage." Id., 816. Notably, the court rejected the plaintiff's argument that the 1985 CBA required that he be placed on the same health insurance plan as the town's active employees, recognizing that "[t]he term 'active employees' does not appear anywhere in the 1985 CBA . . . ." Id., 810. The court explained: "Although it is reasonable to assume that the parties intended that employees who retired during the three years when the 1985 CBA was in effect would continue to receive the retirement benefits enumerated in article IX [of the 1985 CBA] after the agreement expired in 1987, whether those benefits were to remain static, be pegged to those due to future active employees under future collective bargaining agreements, or be defined in some other manner is never expressly set forth in the agreement." (Emphasis omitted.) Id. *Gallagher*, thus, has little relevance to the present case in which the pension agreement expressly pegged the plaintiffs' benefits to those of active employees.

[10] The defendant additionally contends that the court failed to consider language contained elsewhere in the CBA that "compels a narrower interpre-

The note to article 22.1 (A) (2) of the CBA provides that the defendant's 50 percent "contribution toward the funding of the HDHP plan is not an element of the underlying insurance plan, but rather relates to the manner in which the deductible shall be funded for active employees. The [defendant] shall have no obligation to fund any portion of the HDHP deductible for retirees . . . ." (Emphasis omitted.) We are not persuaded by the defendant's arguments that the note to article 22.1 (A) (2) of the CBA constituted a clarification of the pension agreement or that it resolved a previously unaddressed issue. Instead, the language of the pension agreement is broad enough, considering the definition of deductible, in light of the "nature and scope" prefatory language, to contemplate that the defendant could not avoid its obligation to provide the same coverage by giving active employees targeted dollars to pay their deductible as opposed to giving them a reduced deductible. Such a conclusion would render the "nature and scope" and "but not limited to" language of § 16 (C) of the pension agreement meaningless.

Moreover, as the plaintiffs argue with respect to the note to article 22.1 (A) (2) of the CBA, "[a] statement claiming [that] contributions to the HDHP deductible are not elements does not show [that] the parties agreed to modify the terms of the . . . pension agreement," in that the pension agreement does not refer to "elements" of health insurance.

tation of the terms 'coverage' and 'deductible.' " Specifically, the defendant argues that, because retirees are obligated to pay a greater percentage of their insurance premiums than active employees, the "only reasonable conclusion to be drawn from this premium structure is that the parties to the CBA meant to provide the same coverage, with the same deductible amount, but at disparate costs." We are not persuaded by the defendant's argument. As the trial court noted, § 16 (F) of the pension agreement expressly sets forth the percentages of the premiums to be paid by retirees. Thus, in contrast with deductibles, the pension agreement contemplated different costs of premiums for retirees and for active employees.

The defendant's third argument is that an expansive interpretation of the term deductible to account for the HSA contributions "contravenes the manner in which the federal government regulates HSAs . . . ." In support of this argument, the defendant maintains that HSA funds can be used on items other than the payment of deductibles. The plaintiffs respond by emphasizing that this argument was not raised before the trial court and it "relies upon information that is not in the record . . . ." We agree with the plaintiffs. Both the joint stipulation and the posttrial briefs submitted to the trial court are devoid of any facts or argument regarding the manner in which HSA funds may be used.[11] Thus, the trial court was not apprised of the defendant's position, raised for the first time on appeal, that the nature of the HSA funds should be considered in determining whether the plaintiffs received the same deductible as active employees. In addition, the plaintiffs were never given an opportunity to address this argument in the trial court. Consequently, allowing the defendant to raise the argument now would constitute trial by ambuscade. See *Martin* v. *Todd Arthurs Co.*, 225 Conn. App. 844, 855, 317 A.3d 98 (2024) ("to permit a party to raise a claim on appeal that has not been raised at trial—

---

[11] As noted previously, the joint stipulation's facts related to HSAs are limited to the following statements: "Participants in an HDHP are eligible under the Internal Revenue Code (IRC) § 223, to open and maintain a tax favored [HSA]. . . . Enrollment in an HDHP does not require a participant to open an HSA, but the HDHP participant has the option to do so. . . . Article 22.1 (A) (2) of the CBA expressly requires that active employees open and maintain an HSA in conjunction with their enrollment in the HDHP. . . . There is no requirement that any retiree (e.g., any plaintiff) open and maintain an HSA in conjunction with the HDHP; but retirees, including the plaintiffs, may have that option. . . . An HSA is a personally established and owned private bank account that a participant opens and maintains at a bank of their choosing. . . . Similar to the procedures for 'direct deposit' for payment of regular wages (active employees) or monthly pension payments (retirees), an individual provides the [defendant] with a 'direct deposit' authorization form for payment of any funds the individual wishes to have withheld from their wages/payments and directed to their HSA."

after it is too late for the trial court or the opposing party to address the claim—would encourage trial by ambuscade, which is unfair to both the trial court and the opposing party" (internal quotation marks omitted)). Finally, we are in no position to assess the defendant's factual assertions when there is no evidence in the record to support them. Accordingly, we conclude that we cannot address this argument because of an inadequate record. See *D2E Holdings, LLC* v. *Corp. for Urban Home Ownership of New Haven,* 212 Conn. App. 694, 709, 277 A.3d 261 (record was inadequate to consider argument on appeal), cert. denied, 345 Conn. 904, 282 A.3d 981 (2022).

The defendant's fourth and final argument relies on nonbinding authority from the Wisconsin Court of Appeals. In *Wisconsin Professional Police Assn.* v. *Wisconsin Employment Relations Commission,* 352 Wis. 2d 218, 221, 841 N.W.2d 839 (App. 2013), the court considered two statutory limitations on public sector collective bargaining under the Wisconsin Municipal Employment Relations Act (Wisconsin act), Wis. Stat. § 11.70 (2011–2012), as amended by 2011 Wis. Act 32. The Wisconsin act prohibited bargaining regarding "[t]he design and selection of health care coverage plans by the municipal employer for public safety employees" and regarding "the impact of the design and selection of the health care coverage plans on the wages, hours, and conditions of employment of the public safety employee." (Internal quotation marks omitted.) Id., 222–23. Eau Claire County (county) selected a medical benefit plan, which set deductibles for individuals and families, covering the deputy sheriffs employed by the county. Id., 223. The association representing the deputy sheriffs (association) made a proposal pursuant to which the deputy sheriffs would pay the first portion of the deductible in the amounts of $250 for single persons or $500 for families. Id., 223–24. In response,

the county maintained that the proposal concerned a subject that could not be bargained under the Wisconsin act. Id., 224.

The county and the association jointly sought from the Wisconsin Employment Relations Commission (commission) a declaratory ruling as to whether the proposal addressed a prohibited subject, and the commission concluded that it did. Id. The circuit court reversed the commission's decision, and the commission and the county appealed. Id. On appeal, the court concluded that "the only reasonable interpretation is that the [Wisconsin act] does not prohibit bargaining regarding" what it termed the "deductible payment allocation"; id., 226; that is, "the allocation of responsibility between employees and employers to pay deductibles required under a health care coverage plan."[12] Id., 222.

The court proceeded with its statutory interpretation, relying on the following premises: "[T]he [c]ounty is free to design and select, in any manner it chooses and without negotiation with the [a]ssociation, a plan that includes no deductibles or deductibles of any amount. That is, the existence and amounts of deductibles are elements of a plan, or elements of plan design, that the [c]ounty may unilaterally create or pick in any way." Id., 232. Thus, the dispute centered on whether the deductible payment allocations were elements of "health care coverage plans . . . ." (Internal quotation marks omitted.) Id. The court concluded, as a matter of plain language interpretation, that they were not.

---

[12] The court in *Wisconsin Professional Police Assn.* v. *Wisconsin Employment Relations Commission*, supra, 352 Wis. 2d 230, first identified a point of agreement between the parties, specifically, that the "design and selection of . . . plans" language in the Wisconsin act "covers the decision as to whether a plan will have deductibles, and if so, in what amounts. Consistent with this understanding, the [a]ssociation did not propose bargaining with the [c]ounty over the existence or size of the deductibles in the plan selected by the [c]ounty, and does not now suggest that this is a mandatory bargaining subject." (Internal quotation marks omitted.)

Id. Specifically, the court reasoned that health care coverage plans address the rights and obligations flowing between the insurer and the insured and that any element of a plan must concern these rights and obligations. Id., 233. Although a deductible concerns these rights and obligations, the court found the deductible payment allocation to be extrinsic to these rights and obligations because it is "an allocation not between insurer and insured, but between employer and employee." Id. The defendant in the present case also quotes an unpublished Wisconsin decision that relies on *Wisconsin Professional Police Assn.* to conclude that "the allocation between [Manitowoc] County and its employees of payments made into an employee's HSA is not an element of the 'health care coverage plan' designed and selected by [Manitowoc] County and is therefore not a prohibited subject of bargaining." *Manitowoc County Sheriff Dept. Employees* v. *Manitowoc County*, Docket No. 2013AP1, 2015 WL 13123098, *2 (Wis. App. March 4, 2015), review denied, 865 N.W.2d 502 (Wis. 2015).

We are not persuaded by the nonbinding authority cited by the defendant. First, we disagree with the defendant that the issue considered by the Wisconsin Court of Appeals was "precisely the same as the one at bar." The Wisconsin court was tasked with interpreting a statute containing different prefatory language than that at issue in the present case. Specifically, the Wisconsin act prohibited bargaining regarding "the design and selection of health care coverage plans" and the court, in conducting its analysis, considered whether the deductible payment allocation constituted an "element" of a health care coverage plan. (Emphasis omitted; internal quotation marks omitted.) *Wisconsin Professional Police Assn.* v. *Wisconsin Employment Relations Commission*, supra, 352 Wis. 2d 231–32. This analysis contrasts with the question presented before

this court, namely, whether "the nature and scope of coverages, including but not limited to deductibles" are the same for the plaintiffs as for the active employees where the defendant funds 50 percent of the active employees' deductibles through HSA contributions.

*Wisconsin Professional Police Assn.* is distinguishable in another important respect. Its reasoning was premised on the relationship between three parties— the employer, the insured employee, and an insurer. See *Wisconsin Professional Police Assn.* v. *Wisconsin Employment Relations Commission*, supra, 352 Wis. 2d 233. Indeed, the court determined that the deductible payment allocation was "extrinsic" to the rights and obligations between the insurer and the insured because it is "an allocation not between insurer and insured, but between employer and employee." Id. As the parties in the present case stated in their joint stipulation, the defendant "self-insures its group health insurance benefits. . . . [Anthem], through an administrative services contract with the [defendant], administers the benefits on the [defendant's] behalf. . . . As a town offering self-insured health benefits to its employees and retirees, the [defendant] does not pay any portion of a 'premium' to Anthem but is billed by Anthem for the total cost of all claims made by active employees and retirees for health insurance benefits together with an administrative fee collected by Anthem, as the administrator." Thus, the present case is factually distinguishable from *Wisconsin Professional Police Assn.* because the defendant is both the employer and the insurer, and its payment of 50 percent of the deductible into the active employees' HSAs means that the defendant effectively pays the first $1000 or $2000 of costs before the active employees use the portion of the deductible that they funded.

For the foregoing reasons, we conclude that the trial court correctly determined that the defendant's payment of 50 percent of the deductible as a contribution

to only the active employees' HSAs contravenes the terms of the pension agreement because the effect of the defendant's action is that the plaintiffs do not receive the same "nature and scope of coverages, including but not limited to deductibles," as active employees.

IV

The defendant's final claim on appeal is that the court erred in awarding damages to the plaintiffs. Specifically, the defendant argues that the court's damages award "places the plaintiffs in a materially better position than they would have been had they been paid HSA contributions or other in-kind payments." We are not persuaded.

The following additional procedural history is relevant. As noted previously, the court, in its memorandum of decision, ordered the parties to submit briefs addressing damages. The plaintiffs, in their brief, in addition to requesting prejudgment interest and attorney's fees, argued that they were entitled to HSA contributions for five years beginning in 2018. In its brief, the defendant argued, inter alia, that the plaintiffs were not entitled to the full amount of the HSA contributions on the basis of the following stipulated fact: "Following the move of all active police officers and retirees from the PPO plan to the HDHP in 2018, the Allocated Rate for the active police officers, compared to the Allocated Rate for the retirees, in each of the 'Single,' 'Two-Person' and 'Family' categories is approximately 6.5 percent more for active police officers in each of the fiscal years listed." According to the defendant, because the plaintiffs would have been charged higher Allocated Rates for their health insurance premiums had they received the HSA contributions, the defendant was entitled to offset the HSA contributions to cover the percentage of the higher Allocated Rates that the plaintiffs would have paid. The plaintiffs responded that, because

"the financial benefit justifying the upward adjustment was not paid by the employer to benefit the participant in the applicable plan year, it is apparent that the underlying condition justifying the rate increase did not occur." Specifically, the plaintiffs referred the court to the joint stipulation, which provided the explanation for the difference in the Allocated Rate, specifically, that " '[t]he Allocated Rate, per Anthem, is adjusted (increased) to account for a reduction in consumerism on the part of the participants who receive financial funding to their [HSAs] from their employer. The percentage of the upward adjustment in the base Allocated Rate for such participants is dependent on the financial benefit paid by the employer to the participant.' " According to the plaintiffs, "[i]t must be presumed that there was no 'reduction in consumerism' in the plaintiffs' spending on health care costs to warrant the premium increase because the plaintiffs did not receive the benefit in the applicable plan year." The court held a hearing on February 16, 2023. In its May 2, 2023 order, the court declined to deduct the 6.5 percent increase in premium from its award of the HSA contributions.

On appeal, the defendant's claim with respect to damages is limited to its contention that the court erred in declining to deduct the 6.5 percent from the plaintiffs' damages. We begin with the applicable standard of review. "As a general matter, [t]he trial court has broad discretion in determining whether damages are appropriate. . . . Its decision will not be disturbed on appeal absent a clear abuse of discretion."[13] (Internal quotation marks omitted.) *Wall Systems, Inc.* v. *Pompa*, 324 Conn. 718, 729, 154 A.3d 989 (2017).

---

[13] The defendant contends that the proper standard of review of the court's award of damages is plenary. We disagree, as the defendant's claim does not present questions of law but, rather, challenges the propriety of the court's damages award. Thus, the abuse of discretion standard is appropriate.

With this deferential standard in mind, we conclude that the damages award was appropriate. The court expressly rejected the defendant's contention that it was entitled to an offset for the 6.5 percent increase in premium that the plaintiffs would have incurred had they received the HSA contributions. This rejection was supported by the undisputed evidence that the increase in premium was "to account for a reduction in consumerism on the part of [the] participants who receive financial funding to [their HSAs] from their employer." Thus, we are persuaded by the plaintiffs' argument that, because they did not receive the benefit of the contributions to their HSAs in real time, the justification of a reduction in consumerism underlying the premium increase did not occur and the reduction should not be applied retroactively to them. Accordingly, we conclude that the court did not abuse its discretion in awarding damages.

V

In their cross appeal, the plaintiffs claim that the court abused its discretion in denying their request for attorney's fees as a sanction for the defendant's bad faith litigation conduct. We are not persuaded.

The following additional procedural history is relevant to our resolution of this claim. On November 21, 2019, the plaintiffs filed a motion for sanctions and a memorandum of law in support. Therein, they sought recovery of attorney's fees incurred in responding to the defendant's motion to dismiss, which they alleged raised baseless claims that were without factual support and were contrary to controlling precedent.[14] The defendant filed an objection and a memorandum of law in

---

[14] The plaintiffs also alleged that the "defendant engaged in deceitful conduct to obtain a postponement of [a] hearing scheduled for December 17, 2018, at which time the plaintiff[s] would have (at the very least) been able to obtain a ruling on subpoenaed documents. The defendant then refused to abide by the agreement to provide documents subpoenaed, which was a prerequisite to the plaintiffs' agreement that led to the postponement of the hearing on December 17, 2018."

opposition to the motion for sanctions. The court, *Swienton, J.*, denied the motion, stating that it could not find that the defendant had acted in bad faith in moving to dismiss the plaintiffs' complaint. In their January 27, 2023 posttrial brief addressing damages and attorney's fees, the plaintiffs reiterated their claimed entitlement to sanctions related to the defendant's motion to dismiss, which the defendant disputed in its posttrial brief. The court held a hearing on February 16, 2023, during which both parties presented argument with respect to attorney's fees.[15]

In its May 2, 2023 order, the court declined to award attorney's fees because the plaintiffs failed to establish that the defendant had acted in bad faith. Specifically, the court stated: "The record does not reflect clear evidence that the challenged acts by the defendant are entirely without color or that the acts were taken for reasons of harassment or delay or for other improper purposes. . . . Indeed, both sides made arguments in good faith to the court regarding the interpretation of the pension agreement and the CBA." (Citation omitted.)

We begin our analysis by setting forth the relevant legal principles regarding awards of attorney's fees for litigation misconduct. "[T]his state follows the general rule that, except as provided by statute or in certain defined exceptional circumstances, the prevailing litigant is ordinarily not entitled to collect a reasonable [attorney's] fee from the loser. . . . That rule does not apply, however, where the opposing party has acted in bad faith. . . . It is generally accepted that the court

---

[15] The plaintiffs' counsel stated: "I know that the motion for sanctions has already been decided and would be considered the law of the case and, of course, Your [Honor is] not bound by the law of the case if Your Honor believes a different decision would be made, but I suspect that if I have—that the only review of that decision . . . for me or my clients would be on appeal."

has the inherent authority to assess attorney's fees when the losing party has acted in bad faith, vexatiously, wantonly or for oppressive reasons. . . . This bad faith exception applies, not only to the filing of an action, but also in the conduct of the litigation. . . . It applies both to the party and his counsel. . . .

"We have explained that, in order to impose sanctions under the bad faith exception, the trial court must find both that the litigant's claims were entirely without color and that the litigant acted in bad faith. . . . The court must make these findings with a high degree of specificity . . . . The requirement of an independent finding that the challenged actions or claims are entirely without color ensures that fear of an award of [attorney's] fees against them will not deter persons with colorable claims from pursuing those claims . . . . The requirement of that independent finding means that, if a court concludes that a claim is colorable, it cannot award attorney's fees, even if the court were to conclude that the person against whom sanctions are sought acted in bad faith. When, as in the present case, the actor's bad faith is predicated on the theory that he knowingly brought claims entirely lacking in color, colorability and bad faith are, by necessity, closely linked. . . .

"Colorability is measured by an objective standard, whereas bad faith is measured by a subjective one. Colorability focuses on the merits of the claim. A colorable claim is defined as one that is legitimate and that may reasonably be asserted, given the facts presented and the current law (or a reasonable and logical extension or modification of the current law). . . . Put another way, a claim is colorable if, given the facts presented and the current law (or a reasonable extension thereof), the claim arguably has merit. Although we have stated that the standard for colorability varies

depending on whether the person against whom sanctions are sought is a party or the party's attorney . . . the inquiry is the same in either case. As the United States Court of Appeals for the Second Circuit has explained, [a] claim is colorable, for the purpose of the bad faith exception, when it has some legal and factual support, considered in light of the reasonable beliefs of the individual making the claim. . . . Put simply, the colorability inquiry asks whether there is a reasonable basis, given the facts, for bringing the claim, regardless of whether it is brought by an attorney or a party.

"A determination of bad faith, by contrast, rather than focusing on the objective, reasonable beliefs of the person against whom sanctions are sought, focuses on subjective intent. We have emphasized that, in determining whether a party has engaged in bad faith, [t]he appropriate focus for the court . . . is the conduct of the party in instigating or maintaining the litigation. . . . From that conduct, the court may infer the subjective intent of the person against whom sanctions are sought. Some examples of evidence that would support a finding of bad faith include a party's use of oppressive tactics or its wilful violations of court orders . . . or a finding that the challenged actions [are taken] for reasons of harassment or delay or for other improper purposes . . . ." (Citations omitted; emphasis omitted; internal quotation marks omitted.) *Lederle* v. *Spivey*, 332 Conn. 837, 843–46, 213 A.3d 481 (2019).[16]

---

[16] The plaintiffs rely on *Lederle* v. *Spivey*, supra, 332 Conn. 846, in support of their claim that the court abused its discretion in declining to award attorney's fees. We note that our Supreme Court in *Lederle* applied the appropriate deferential standard of review to conclude that the trial court did not abuse its discretion in awarding attorney's fees. Id. In contrast, the plaintiffs in the present case must overcome the high hurdle of establishing an abuse of discretion. See *Jacques* v. *Jacques*, 223 Conn. App. 501, 510, 309 A.3d 372 (2024) ("[u]nder the abuse of discretion standard of review, [w]e will make every reasonable presumption in favor of upholding the trial court's ruling, and only upset it for a manifest abuse of discretion" (internal quotation marks omitted)). The plaintiffs have not cited any cases in which our appellate courts have determined that a trial court abused its discretion

"Generally, we apply the abuse of discretion standard when reviewing a trial court's decision to deny an award of attorney's fees. Under the abuse of discretion standard of review, [w]e will make every reasonable presumption in favor of upholding the trial court's ruling, and only upset it for a manifest abuse of discretion. . . . [Thus, our] review of such rulings is limited to the questions of whether the trial court correctly applied the law and reasonably could have reached the conclusion that it did." (Internal quotation marks omitted.) *Barber* v. *Barber*, 193 Conn. App. 190, 203–204, 219 A.3d 378 (2019).

In the present case, the court accurately set forth the relevant legal standard in denying the plaintiffs' request for attorney's fees. See *Cokic* v. *Fiore Powersports, LLC*, 222 Conn. App. 216, 229, 304 A.3d 179 (2023). The court then made findings that the plaintiffs failed to prove both that the defendant's claims were entirely without color and that the defendant acted in bad faith. As noted previously, the plaintiffs' failure to prove either prong required the court to deny their request for attorney's fees. See *Berzins* v. *Berzins*, 306 Conn. 651, 663, 51 A.3d 941 (2012) (reversing judgment awarding attorney's fees because, although court found administrator's actions were without color, it did not make separate finding that administrator acted in bad faith).

The defendant responds to the plaintiffs' claim by maintaining that the plaintiffs' failure to offer any evidence in support of their request for attorney's fees "deprived the court of any basis on which to find that the [defendant's] claims were not colorable, let alone that they were made with subjective bad faith." The plaintiffs, in their reply brief, acknowledged that they

in declining to award attorney's fees in response to a claim of bad faith litigation conduct.

had received a hearing on their motions for sanctions and that they did not request to present evidence. They maintain that evidence was unnecessary because their motion for sanctions was based on the defendant's claims as raised in its motion to dismiss. On this record, we conclude that the plaintiffs have not sustained their burden of demonstrating that the court abused its discretion in denying their request for attorney's fees because the court reasonably could have determined that the plaintiffs failed to prove both that the defendant's claims, as raised in its motion to dismiss, were entirely without color and that the defendant acted in bad faith.[17] See *Jacques* v. *Jacques*, 223 Conn. App. 501, 516, 309 A.3d 372 (2024) ("[c]onclusory statements that the plaintiff lacked a colorable claim or acted in bad faith are not sufficient to meet the high threshold required under our law").

Accordingly, we conclude that the court did not abuse its discretion in declining to award attorney's fees.

The judgment is affirmed.

In this opinion the other judges concurred.

---

[17] In light of our conclusion, we need not address the defendant's contention that the plaintiffs' motion improperly failed to specify whether the award for attorney's fees was sought against the defendant or its counsel.